**In re NOYES. In re GEARY. In re WOOD. In re FROST.**

(Circuit Court of Appeals, Ninth Circuit. January 6, 1902.)

Nos. 701, 702, 703, and 744.

1. CONTEMPT OF COURT—PROCEEDINGS FOR PUNISHMENT—EVIDENCE.

In proceedings for contempt of court in refusing to obey and obstructing the execution of writs of supersedeas granted by it. evidence of the relation of the respondents to the litigation or the parties concerned, and showing other acts of misconduct on their part in relation thereto besides those charged, is admissible to show their animus and motives and to characterize their action.

2. SAME — JUDGE — OBSTRUCTING EXECUTION OF WRIT OF SUPERSEDEAS FROM APPELLATE COURT.

Respondent, as judge of the District Court for one of the districts of Alaska, made ex parte orders in a number of suits instituted in aid of actions of ejectment to recover placer mining claims, appointing the same person receiver in each case, and directing him to take possession of the claims, with all personal property of the defendants thereon, and to work the claims and to hold the gold taken therefrom, subject to the order of the court. The pleadings had not been filed nor any process issued, the affidavits on which the applications were made were not read, and the orders signed had been previously prepared at the instance of the man who was thereby appointed receiver. His bond was fixed at $5,000 in each case, although in one case plaintiff's showing was to the effect that the daily output of the claim was $15,000. Respondent denied motions by defendants for removal of the receiver, and refused to allow an appeal. An appeal was subsequently allowed by a judge of the Circuit Court of Appeals, who also approved bonds given by defendants, and granted writs of supersedeas commanding respondent to stay any and all further proceedings in relation to said orders and the appointment of a receiver, and commanding the receiver to restore to the defendants all property which he had taken or received as such receiver. The writs were served, but the receiver refused to obey them, and, on application to respondent, he refused to make any order requiring the receiver to obey. The receiver then had in his possession gold dust taken from the claims to the value of about $200,000, which was stored in a bank. Respondent wrote a letter to the marshal requesting him to preserve peace and good order. and to "hold things in statu quo," and also a letter to the military commander asking him to render the marshal such assistance as required, and supplemented such letters by oral instructions to the marshal to guard the gold dust, and not to permit any of the parties to obtain possession of it. *Held*, that such letters and instructions were overt acts which had the direct effect of interfering with the execution of the writs of supersedeas, and. in view of the other action of respondent and his refusal to order his receiver to obey the writs, constituted a contempt of the Circuit Court of Appeals.

3. SAME—ATTORNEY—RIGHT TO GIVE LEGAL OPINION.

An attorney for a receiver, who advised his client that in his opinion a writ of supersedeas granted by an appellate court on appeal from the order making his appointment was void because the order was not appealable, and that, even if valid, it did not require him to turn over certain property in his hands, but who did not advise the receiver as to what his action should be or to disobey the writ, did not thereby go beyond the legitimate privilege of an attorney in giving legal advice, and was not guilty of a contempt of court.

4. SAME—OBSTRUCTING EXECUTION OF WRIT.

A receiver had in his hands a quantity of gold dust taken from mining claims which he was operating, stored in boxes in safe-deposit vaults, at a time when he was arrested for contempt of court in refusing to obey a writ of supersedeas commanding him to restore the property pending

121 F.—14

an appeal. He turned the keys to the boxes over to respondent, who was district attorney, and told the marshals who had him in charge that he had done so. They demanded the keys of respondent for the purpose of executing the writ of supersedeas, but he refused to give them to them, and used language which indicated that his action was willful and deliberate. *Held*, that he was guilty of a contempt of the court issuing the writ.

**5.** SAME.

On the organization of the judicial districts in Alaska, respondent, an attorney, was sent there as a special examiner by the department of justice to instruct the clerk and marshal as to their duties and the keeping of their accounts. In private litigation over mining claims a receiver had been appointed to work the claims, who had taken therefrom a large quantity of gold, which he had stored in the vaults of a bank, when a writ of supersedeas was issued by the Circuit Court of Appeals commanding him to restore all property in his hands. Respondent, with knowledge of such writ and that the receiver had refused to obey it, advised the marshal to guard the gold in the bank, and to prevent the defendants from obtaining it. He also wrote him a letter stating that if it became necessary for him to incur extraordinary expense "in suppressing specific unlawful acts of violence or attempted violence, burglary, robbery, etc.," there was an extraordinary expense fund from which he could be reimbursed. He also employed three detectives for several weeks, who were paid from government funds, and ostensibly in its service, but were in fact employed on behalf of the receiver, with whom respondent was on intimate terms. *Held*, that his action in advising the marshal as he did, in the light of his other conduct, was clearly intended to obstruct the execution of the writ of supersedeas, and constituted a contempt of court.

E. S. Pillsbury, amicus curiæ.

P. J. McLaughlin and F. J. Heney, for Arthur H. Noyes and C. A. S. Frost.

J. G. Maguire, for Thomas J. Geary.

Joseph K. Wood, in pro. per.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge. The affidavit upon which the order to show cause was directed to Arthur H. Noyes charges that on July 23, 1900, said Arthur H. Noyes, as judge of the District Court of Alaska, Second Division, at Nome, Alaska, signed an order in the action entitled Chipps vs. Lindeberg et al., appointing Alexander McKenzie receiver of property described in the complaint, which consisted of a placer mining claim, and enjoined the defendants, who were then in possession of the claim, from working the same; and on the same date made similar orders in four other similar causes pending, viz., Melsing vs. Tornanses, Comptois vs. Anderson, Rodgers vs. Kjellman, and Webster vs. Nakkeli et al. That thereupon the receiver took possession of the claims, and proceeded to mine the same, and extracted therefrom gold dust of the value of more than $100,000. That the defendants in each of the said cases presented to the said Arthur H. Noyes, judge of said court, a petition for the allowance of an appeal from said order, together with an undertaking on appeal and assignment of errors, but that the said Arthur H. Noyes refused to grant said petition or to allow such appeal. That thereafter, on August 29, 1900, Honorable W. W.

Morrow, one of the judges of this court, made orders allowing appeals in said cases, and directing that writs of supersedeas issue thereon out of this court, directed to the said Alexander McKenzie and the said Arthur H. Noyes, commanding the said Noyes to desist from any further proceedings on account of said orders, and commanding the said McKenzie to restore to the defendants in said cases all property which he had taken or received as receiver. That on September 14, 1900, certified copies of said orders allowing such appeal in some of said cases, and writs of supersedeas in all of said cases, were filed in the office of the said District Court at Nome, and certified copies of the writs of supersedeas were served upon said Arthur H. Noyes, and also upon the said receiver; and demand was made upon the latter that he return to the defendants in said actions the gold and gold dust which he had taken from the claims described in the complaints in said actions, which gold dust was then in his possession, and was of the value of about $200,-000. That said receiver refused to deliver said gold dust, or any part thereof, to the defendants in said actions, and refused to comply with the writs of supersedeas, whereupon application was made by the respective defendants, through their counsel, to the said Arthur H. Noyes for orders directing the enforcement of the writs of supersedeas which had been issued by this court, and that the said Arthur H. Noyes then and there declined to make such orders, saying that the matter was out of his hands. That on September 15, 1900, the defendants in said cases, through their counsel, again requested said Arthur H. Noyes to make an order directing the enforcement of the said writs of supersedeas, but the said Noyes then and there stated and declared that the orders appointing the receiver were not appealable; that the defendants were not entitled to an appeal. That on said last-named date the said Noyes gave instructions to the United States marshal to place a guard over the vaults containing the gold dust, and to prevent access thereto by any person. That the object of said order was to defeat the execution of the said writs of supersedeas. That on said date the said Arthur H. Noyes, in the presence of T. J. Geary, said to the said marshal, "Go ahead and keep possession of the gold dust, and do not let McKenzie or any of the parties go near it," and that at the same time the said Noyes stated, in the presence of said Geary, that he did not think the order appointing McKenzie as receiver was an appealable order, but that, assuming that it was, the only supersedeas that could be effected was one staying proceedings, and that on the record as it was there was no justification for the defendants demanding the return of the property. That on October 6, 1900, in the case of Chipps vs. Lindeberg et al., the plaintiff, by his attorneys, Hubbard, Beeman & Hume, filed a motion in said District Court of the District of Alaska at Nome for an order of the court restraining the defendants in said case from working the placer mining claim in controversy therein, and from taking out of the jurisdiction of said court any gold taken therefrom, and that said motion was based upon an affidavit of the plaintiff, which referred to the writ of supersedeas as "an alleged writ of supersedeas

from the Circuit Court of Appeals of the Ninth Circuit." That upon such motion the said Arthur H. Noyes, judge of said court, ordered that the defendants in said action show cause on October 8th why an injunction should not issue restraining them from further working the claim, and from deporting from the jurisdiction of the court any gold dust taken therefrom. That upon October 10th the said Arthur H. Noyes made an order upon such application for an injunction, enjoining the defendants in said action from removing any gold dust taken from said placer claim to any place outside of the Nome precinct, District of Alaska. That the conduct of the said Arthur H. Noyes after the appointment of the said receiver, and above described, was for the purpose of interfering with and preventing the enforcement of said writs of supersedeas. The answer of Arthur H. Noyes admits that he refused to make an order requiring the receiver to return the gold dust to the defendants, but avers that he did not believe he could or should make such an order, and that all matters pertaining to the receivership had passed beyond his control, except such orders as he was required to make by the terms of the writ. That he did not state, as a reason for refusing to make an order requiring the receiver to deliver the gold dust, that the orders appointing the receiver were not appealable, but admits that it was his judgment and opinion that such orders were not appealable. He denies that he ordered the marshal to allow no one, especially McKenzie, or the parties interested, to have access to the vaults in which the gold dust held by the receiver was deposited, or that he stated to the said marshal to go ahead and keep possession of the gold dust. He admits that he stated that the only order he could make in such cases was one staying proceedings; that the writ of supersedeas directed him to stay all proceedings in the receivership matter, and to desist and refrain from any further acts in connection therewith; and he alleges that the injunction of October 10th was made upon the belief and in the full conviction that such order was within his power as a judge in the said case then pending, for the reason that the appeals had been taken only from the orders appointing the receiver, leaving all other matters in said causes pending in the District Court for further proceedings. That in all the matters set forth in the charges he acted in good faith, and in full respect for the authority, writs, and orders of this court, and he denies that he sought to interfere with or prevent the enforcement of the writs of supersedeas.

Of the evidence which was taken upon the issue raised by the answer of Arthur H. Noyes to the order to show cause, a large proportion consists of testimony concerning the attitude of the judge toward the litigation then pending before him in the cases which are hereinafter referred to, as well as in other cases in which McKenzie was receiver or was interested. Much of it tends strongly to show the existence of a criminal conspiracy between some of these respondents and McKenzie and others to use the court and its process for their private gain, and to unlawfully deprive the owners of mines who were in possession thereof of their property under the forms of law. Concerning this portion of the evidence, it is not

necessary to express an opinion. The respondents are on trial here for the offense of contempt of the process of this court, and for no other offense. Reference to the evidence of their misconduct will be made only for the purpose of finding the animus which actuated them in the commission of the acts with which they stand charged. We find it unnecessary to discuss all of this evidence in detail. We shall assume as proven none of the material facts which are testified to, except such as are not disputed, or are corroborated by other evidence, or are so well sustained by the proofs as to leave in our minds no reasonable doubt of their truth.

Judge Noyes arrived at Nome on July 19, 1900, in company with other officers of his court, and in company with Alexander McKenzie. Prior to going to Nome, McKenzie had been engaged in organizing the Alaska Gold Mining Company, a corporation, for the purpose of engaging in mining at Nome, and in that connection had made the acquaintance of O. P. Hubbard, a member of the firm of Hubbard, Beeman & Hume, attorneys at Nome, Alaska. On the day of his arrival at Nome, McKenzie went to the office of Hubbard, Beeman & Hume, and had an interview with Mr. Hume, in which he told the latter that Hubbard had transferred to him, McKenzie, his interest in the litigation which involved the right of possession of the Anvil Creek mining claims, and that Hubbard had represented to him that the other members of the firm would do the same, that is, would transfer to his corporation the contingent interest they had in those claims. The contingent interest of Hubbard, Beeman & Hume was a one-half interest in the claims in case the plaintiffs prevailed. Hume testified that McKenzie further represented to him and to Beeman that he controlled the appointment of the judge and the district attorney, and that if they desired to have those cases heard it would be absolutely necessary to transfer their interest to his corporation, and receive in lieu certificates of stock, and he testified that, at the same time, McKenzie demanded that a one-fourth interest of the business of Hubbard, Beeman & Hume be transferred to Joseph K. Wood, the district attorney, and that Wood become a silent partner in the firm, and stated that, if all this were assented to, Hume should become deputy district attorney. The evidence shows that Hume and his partners agreed to these suggestions, and Wood became a silent partner in the firm of Hubbard, Beeman & Hume, and that Hume was appointed deputy district attorney. All this was done on Thursday, July 19th. The evidence shows that on the same day, and immediately after making these arrangements, McKenzie took Hume and Beeman aside and demanded that an entire one-fourth interest of the firm be placed in his, McKenzie's, name, and that he receive one-fourth of the profits. Hume testified that this was assented to on the next morning, after much objection and hesitation, and only after McKenzie had threatened him that, if he refused, his business and the interests of his clients would be ruined. He testified further that partnership articles were drawn up and signed in accordance with the agreement. Wood admitted that the agreement was entered into whereby he and McKenzie were each to have a one-fourth interest in the firm, but he expressed the belief that it was never acted upon or carried out so far as McKenzie's

interest was concerned. At that time Hubbard, Beeman & Hume were attorneys for the plaintiffs in four actions at law that were pending concerning the title to four of the best placer mining claims on Anvil Creek. Immediately after entering into the partnership agreement, McKenzie directed the firm to get all their stenographers at work preparing papers for applications for the appointment of receivers in those actions. This was done in the four cases then pending, to wit, Rodgers vs. Kjellman, involving claim No. 2 below Discovery on Anvil Creek; Comptois vs. Anderson, involving claim No. 3 above Discovery; Melsing vs. Tornanses, involving claim No. 10 above Discovery; and Webster vs. Nakkeli, involving a claim on Nakkeli Gulch, tributary to Anvil Creek; and a new action was brought, Chipps vs. Lindeberg et al., involving Discovery Claim on Anvil Creek. The firm of Hubbard, Beeman & Hume employed three stenographers, and were busily engaged until the afternoon of Monday, July 23d, in making out papers. Bills in equity and affidavits in aid of the pending actions at law were prepared in all these causes except in Rodgers v. Kjellman. In that case, the receiver was appointed upon a complaint in ejectment and affidavits. In Melsing vs. Tornanses, the bill was not verified. While the papers were being prepared, McKenzie was constantly in and about the office of Hubbard, Beeman & Hume, urging haste. On Monday morning, July 23d, he had a wagon waiting in front of the office of the firm for the purpose of conveying himself and his keepers to take possession of the mines as soon as he should be appointed receiver. Monday afternoon there were two such wagons waiting. These facts are shown by the testimony of several disinterested witnesses, one of whom, Arthur M. Pope, testified that as early as 9 or half past 9 o'clock in the morning his attention was directed to teams standing ready to convey McKenzie and others to the mines on Anvil Creek, and that on that day, or perhaps the day before, he had received information from Hubbard, Beeman & Hume that McKenzie would be appointed receiver of those mines. Between half past 5 and 6 o'clock in the evening of Monday, July 23d, the papers having been prepared, but not filed, Mr. Hume called upon Judge Noyes at his hotel, presented his papers, and asked for the appointment of a receiver in the five suits. Mr. Hume testified that he started to read the affidavit of the plaintiff in one of the cases, whereupon the judge said it was not necessary to read the affidavit, and asked for the orders, and that the witness then stated that he desired to recommend for appointment Alexander McKenzie, to which the judge replied that he had known McKenzie for many years, that he was a very good man, and that, as he was a stranger in the country, he would prefer to appoint someone with whom he was acquainted; and thereupon he appointed McKenzie receiver of all of said mining claims, with instructions to take immediate possession of the same and work them, and to preserve the gold dust and proceeds of the claims subject to the further orders of the court; and all persons then in possession of the claims were ordered to deliver to the receiver immediate possession, control, and management thereof, and were enjoined from in any manner interfering with the mining or working of the claims, or the receiver's control or management thereof. The amount of the bond

required of the receiver was in each case only $5,000, and this in the face of the showing made by the plaintiff's affidavit in one of the cases that the daily output of the mine involved therein was $15,000. Immediately after the orders were signed, and before any bonds were filed, and before the papers were filed by the clerk, or the summons had been issued, the receiver proceeded to take possession of the five placer claims involved in those suits. The appointment of a receiver in these cases was a complete surprise to the defendants therein. Judge Chas. S. Johnson, formerly the district judge of Alaska, who was an attorney for certain of the defendants, testified that, in a conversation he had with Judge Noyes on his arrival, the latter had stated that his court would not be open for business until his return from St. Michaels; that he would go there in a few days, and there formally open his court and spread his commission on the records, and return; that he would keep a clerk or deputy at Nome until he returned, but added: "He will transact no business until I return from St. Michaels." The fourth section of the act of June 6, 1900, under which Judge Noyes was appointed, provided that the Judge of the Second District of Alaska should reside at St. Michaels, and it authorized him to hold court elsewhere in the district upon giving at least 30 days' notice. 31 Stat. 321–323. This notice was given by Judge Noyes by publication. It was dated July 21, 1900, and gave notice that a special term of the District Court would be held at Nome on Monday, August 22, 1900, or as soon thereafter as practicable and convenient. Upon learning that a receiver had been appointed, the attorneys for the defendants in those cases endeavored to obtain an order setting aside the appointment. Samuel Knight, an attorney for certain of the defendants, prepared papers and called upon the judge on July 24th, and requested that his motion be set for hearing immediately, or as soon as possible. The judge replied that the matter could not then be taken up nor until after his return from St. Michaels. Mr. Knight urged that the matter be set for hearing at 3 o'clock that afternoon, to which the judge replied that the notice was too short. Judge Noyes declined to give the order or to set the cases for hearing, whereupon Mr. Knight said he would serve a notice on Hubbard, Beeman & Hume, and would be there at 3 o'clock in the afternoon. At 3 o'clock counsel appeared, the motions were argued, and Judge Noyes announced that he would render his decision on the following Monday. On the following Monday, July 30th, he made no decision. Two days later he left Nome for St. Michaels. After he returned, the motions were reargued on August 3d and 4th. On August 10th they were decided adversely to the defendants. W. H. Metson and Judge Kenneth M. Jackson, on behalf of the defendants whom they represented, made similar motions and efforts to obtain orders setting aside the appointment of the receiver in their cases. In the meantime, on July 25th, Judge Noyes made an order in the case of Chipps vs. Lindeberg et al., which should receive more than casual notice. W. H. Metson, one of the attorneys for the defendants in that case, hearing that the receiver had taken possession of the personal effects of the defendants therein, went on July 24th to the judge and asked him to make an order so construing the order of the 23d as to permit the defendants to re-

main in the possession of their tents and their personal property, and thereupon the judge so ordered. On July 25th, Mr. Metson having heard that the judge had made a statement that he had been imposed upon in making the order of the previous day, went to the judge and stated what he had heard, and remarked that he was not in the habit of imposing upon judges, and did not intend so to do. To which Judge Noyes replied: "Your people are preventing the receiver from working the Discovery claim. I am going to tie your people up all around. I am going to make an order which will take everything away from them." Mr. Metson protested against this, and requested the judge not to take so drastic a remedy, and drew his attention to the fact that the complaint called for the possession of the mine only; and he argued that to take away the tools and supplies and personal effects of the defendants would be a great injustice. To which Judge · Noyes replied: "I have been imposed upon, and I am going to tie them up." Mr. Metson testified positively to these facts. Judge Noyes admitted that portions of Metson's testimony are true, and made uncertain denial of the remainder. We entertain no doubt, in view of all the facts and circumstances, and the nature of Judge Noyes' own testimony, that the interview occurred substantially as testified to by Mr. Metson. He testified further that he requested the judge to refrain from making such an order, and that the judge declared his purpose to make it, and told him if he got anything he would have to see McKenzie about it. Judge Noyes denied that he referred Metson to McKenzie. The order which was made on July 25th was entitled an "order enlarging the powers of receiver." Among other things, it directed the receiver to "take possession of all sluice boxes, pumps, excavations, machinery, pipe, plant, boarding houses, tents, buildings, safes, scales, and all personal property, fixed and movable, gold, gold dust, and precious metals, money boxes, or coin, and all personal property upon said claim." The receiver took possession of the tents and the beds of the men, the men's own personal property, the boxes of gold dust belonging to the men, the gold dust taken from other claims belonging to the defendants, the contents of the safe, and the time books of other claims which the defendants were working, and there was no redress until some six weeks later, when the receiver, on the advice of his counsel, surrendered a few of the things so taken.

On August 15th the defendants applied to Judge Noyes for orders allowing them appeals to this court from the orders appointing the receiver, and accompanied their application in each case with bonds and assignments of error, and presented bills of exceptions. The applications were denied. After the appeals had been subsequently allowed by the order of the Honorable W. W. Morrow, one of the judges of this court, and copies of the orders of the judge and the writs of supersedeas thereupon issued had arrived at Nome on September 14th, Marshal Vawter on that day served the writs upon Judge Noyes and upon the receiver. Mr. Knight called upon the judge on the same day and stated to him that he had come to see about getting an order to put into effect the writs of supersedeas, and the judge said to him: "I can do nothing about this order; this litigation has caused me

a great deal of worry. My hands are tied; the court has taken the whole matter out of my hands. You gentlemen have got to fight this thing out among yourselves," and he added: "I shall make no order; it is not my duty to do so; it is not within my province or right to do so." On the following day Mr. Knight made a similar application for such order, and presented to the judge a form of order, to which, he testified, the judge replied that he had talked with Mr. McKenzie, and had come to the conclusion that the writs were void, and added: "You have laid a very suspicious emphasis upon the injunctional part of these orders; you are not entitled to an appeal, and your record shows evidence of a great deal of haste." Judge Noyes further stated to Mr. Knight that he was having an order prepared. Cornelius L. Vawter, who was the marshal of the District Court of Alaska, Second Division, in the fall and summer of 1900, testified that on September 14th he served copies of the writs upon Judge Noyes and McKenzie, and that later in the same day he called upon the judge and asked if there was anything that could be done in relation to the writs, and that the judge answered that he was not going to do anything; McKenzie could do as he pleased. The marshal testified that on the following day, while he was in consultation with Major Van Orsdale, he received from Judge Noyes the following letter:

"Nome, Alaska, Sept. 15, 1900.

"C. L. Vawter, United States Marshal, City—Dear Marshal: I have been able for the first time to make an examination of the original order sent down from the Circuit Court of Appeals, and find that it will be necessary for me to enter certain orders of record here, which will be done as soon as they can be drawn and spread upon the record. In the meantime, it devolves upon you to preserve the peace and good order so far as it is possible for you to do, and I have taken occasion to request Major Van Orsdale to render such assistance as necessary to protect life and property and to hold things in statu quo until the order can be prepared and presented to the court.

"Sincerely yours,                    Arthur H. Noyes, Judge."

The marshal testified that in connection with the letter, and after he had put a posse of two soldiers in the bank, he had a conversation with Judge Noyes, in which he told the judge what he had done to guard the bullion, and that the judge remarked: "That is right. Hold it there. Don't let this crowd get it; don't let anybody get it; keep the guard on there until further orders." The marshal testified further that it was rumored at that time that the Lane people and the Pioneer Mining Company (the defendants in the Anvil Creek cases) were going to go in and take the bullion out, and that their attorneys had requested him to have the writs enforced, and that he informed Judge Noyes of this later, and that the judge said it was right "not to enforce them; not to let them get the bullion." Marshal Vawter testified that later, at St. Michaels, he had a conversation with the judge, in which he said to the latter: "There is no danger but what you are going to obey the writ of the appellate court, is there?" and the judge answered:

"Don't you think it. In the first place I have got a right to interpret those writs. They have not put up bonds enough. I don't know whether they are genuine or not. I don't know who Frank Monckton is. I am not going to

take any clerk of the court's word for it. In any event the Supreme Court will knock them out when it gets there."

Judge Noyes contradicted the testimony of the marshal in regard to this conversation, and denied that he made the remarks which the marshal attributed to him. There is partial corroboration of the marshal's testimony by that of George V. Borchsenius, the clerk of the court, who testified that he was present during a part of the conversation at St. Michaels, and that he heard some remark of Judge Noyes concerning Mr. Monckton, the clerk of the Circuit Court of Appeals. It should be noted that Marshal Vawter, at the time when he testified, was no longer marshal of the court, and that his feeling toward Judge Noyes was unfriendly, and that he and the judge were not upon speaking terms. Chas. D. French, captain in the United States Army, Seventh Infantry, testified that he was on duty at Nome in August, September, and October, 1900. That he had an interview with Judge Noyes on September 15th, in which reference was made to the writs of supersedeas, and that he asked Judge Noyes what was going to be done about it, to which Judge Noyes answered that he understood it that the writs required him not to do anything whatever. Capt. French further testified:

"There was some further conversation. He directed me not to issue any executive order in reference to these writs, as I understood it. * * * I understood I was required not to undertake the execution of the writs. I was captain of Company K, Seventh Infantry, which was engaged in controlling the town, and was, as I understood it, held responsible for keeping the peace."

Capt. French later testified that when the judge forbade him to issue an executive order he understood it to refer to the writs of supersedeas, and he so informed Major Van Orsdale, his superior officer. Major Van Orsdale, who was in command of the military forces at Nome, testified that, on the morning of September 15th, Kenneth M. Jackson, one of the attorneys for the defendants in the Anvil Creek cases, called upon him and told him that the receiver had refused to comply with the writs of supersedeas, and that there was danger of serious trouble, as a vigilance committee was being or was about to be organized for the purpose of taking possession of the properties that McKenzie was responsible for as receiver, and that he was very anxious that matters should proceed in a lawful way; that if the committee got started there was no knowing where it would end, and very serious trouble would probably result, possibly bloodshed. Kenneth M. Jackson testified that what he told Major Van Orsdale was that McKenzie had refused to obey the writs, and that the marshal had refused to enforce them, and that the defendants were afraid that McKenzie and the plaintiffs would remove the gold dust and get away with it, and that if they did attempt to take the gold dust out of the bank some one would get hurt, and that he wanted the assistance of the military to enforce the writs. We have no hesitation in accepting Mr. Jackson's statement as embodying the truth of the situation. It is fully sustained by the circumstances, and by the general facts in the case as testified to by other witnesses. There was no danger of a general riot or of the

formation of a vigilance committee, and there was no danger of bloodshed unless either the plaintiffs or the defendants or the receiver should attempt by force to remove the gold dust from the safe deposit vault where it was stored. It is true there were miners in Nome at that time who had been working for the receiver whose wages had not been paid, and who were clamorous for payment, but there is no credible evidence that they contemplated or threatened the use of violence to take the gold dust, or for any purpose, or that there was talk of a vigilance committee. Major Van Orsdale testified that he went to see Judge Noyes, together with Capt. French; that he reported to the judge what he had heard about the writs and the danger of riot and bloodshed, and that the judge informed him that the matter had been taken entirely out of his hands, and that he did not know what Mr. McKenzie was going to do about it, but if the matter was brought to his attention he would inform Mr. McKenzie that he should comply with the writ, or words to that effect. That afternoon, about 4 o'clock, Major Van Orsdale received the following letter from Judge Noyes:

"Nome City, Alaska, Sept. 15, 1900.

"Major Van Orsdale, Nome City, Alaska—My Dear Major: After you called with Captain French this morning I saw the original papers on file from the Circuit Court of Appeals, and I find that it is necessary for an order to be entered by this court, which will be entered, of course, as soon as the same can be prepared, and such further steps will be taken as will be a full and complete compliance with the order of the Circuit Court of Appeals. My anxiety in this matter is to do everything in my power, and have all those whom I can in anywise control fully comply with the order of the court above, which, of course, will be done. In the meantime it is necessary that matters should rest in statu quo, and peace and order be preserved, and I therefore request that you render such assistance to the marshal as may be necessary to maintain that peace and quiet.

"Assuring you of my desire to co-operate in every effort that is needful in order to preserve life and property, I am,

"Very sincerely yours,       Arthur H. Noyes, Judge."

Judge Noyes testified that the letter to Major Van Orsdale was written in pursuance of an interview that he had previously had with Major Van Orsdale, when the latter had called upon him and told him there was going to be a disturbance and an attack upon the bank, or that a mob was likely to assemble, and that there was going to be bloodshed.

On September 17th, W. H. Metson made formal application in court for an order directing the receiver to comply with the writs of supersedeas in his cases, and the judge answered, saying that he was preparing a formal order which would be filed. On September 19th, Mr. Metson and Judge Johnson made, in open court, a motion for the enforcement of the writ of supersedeas in the Chipps case, and accompanied the motion with an affidavit that McKenzie had extracted $130,000 from the mine, which he refused to deliver, and they asked the court to make an order on the writ of supersedeas that he transfer that property to the defendants. Judge Noyes, being then engaged in hearing a trial, directed that the trial proceed, and made no answer to the application which was thus

made. It appears that no order was made in open court by Judge Noyes in any of these cases at any time, but Mr. Metson testified that subsequently he found among the papers in the Chipps case orders which bore date September 17th, which were not filed, and which contained, indorsed upon them in pencil, in the handwriting of Wheeler, the private secretary of the judge, the memorandum, "Not to be filed." The order, after setting forth certain recitals, concludes as follows:

"Ordered that all further proceedings herein in relation to said interlocutory order of this District Court of said 23d day of July, 1900, be and are hereby stayed pending the said appeal from said interlocutory order to the Circuit Court of Appeals."

Similar orders were made in the other cases, all bearing date of September 17, 1900. Judge Noyes testified that these orders were made to express his understanding of the requirements of the writs of supersedeas so far as they were directed to him, and that he did not make or authorize the memorandum "not to be filed." The writs contained the following:

"And that you, said Alexander McKenzie, do forthwith return unto the said defendants the possession of any and all property of which you took possession under and by virtue of said order, and that you do make return of this supersedeas, together with your acts and doings thereon, to said District Court for such District of Alaska, Second Division, as you will answer the contrary at your peril, and you, the Judge of said District Court for the District of Alaska, Second Division, are hereby commanded to stay any and all proceedings which may have issued as aforesaid upon said order, and to stay any and all further proceedings io relation to said order and the appointment of a receiver in this case, pending the appeal last aforesaid in this court."

Judge Noyes testified that he was not advised of the fact that Judge Morrow had approved the form of the writs of supersedeas, or that he had taken other action than to make the orders upon which said writs were issued, and that, taking the writs in connection with those orders and the amount of the bonds upon which the appeals had been allowed, which was $35,000 in each case, he was in doubt whether the writs directed the receiver to turn over the gold dust. He testified that he told McKenzie that he, McKenzie, ought to comply with the writs, but as to what was necessary for him to do in order to comply therewith he did not undertake to advise him; that he thought, when the appeals were taken, the whole thing was taken out of his, Noyes', hands, and that he was restrained from taking any further steps in the cases whatever, so far as the receiver was concerned. He admitted that he declined to make an order requiring the receiver to turn over the gold dust, "not believing I was bound to; on the contrary, believing it was not a part of my duty to do so." On October 6th, this gold dust remaining still in the possession of McKenzie, the receiver, but the mining claims involved in the suits having been surrendered by him to the defendants, who were then engaged in mining the same, Chipps, the plaintiff in the case of Chipps v. Lindeberg et al., by his counsel, applied to the court for an order upon the defendants therein, to show cause why they should not be restrained from removing from the terri-

torial jurisdiction of the court the gold dust which they were then extracting from the mine, and accompanied the application with an affidavit setting forth the facts of the allowance of the appeal by Judge Morrow, and the issuance of the writ of supersedeas, which was therein referred to as "an alleged writ of supersedeas of the Circuit Court of Appeals of the Ninth Circuit." Hearing was had upon the order to show cause on October 8th, at which time a discussion was had before the court by counsel for the respective parties concerning the effect of the writ of supersedeas. It was argued on behalf of the plaintiff that inasmuch as the appeal had been taken only from the receivership proceedings, and the main action remained pending before the court, there could be no violation of the writ of supersedeas by enjoining the defendants from deporting the gold dust from the jurisdiction. That argument was met by the defendants' counsel with the proposition that on proper application to the court, and the proper bond being given, the court would have jurisdiction to issue an injunction, but that the court would have no jurisdiction unless the bond was offered, and they contended that the application for the injunction, without the bond, was merely a make-shift to avoid the writ of supersedeas. On October 10th the court made the injunction order, enjoining the defendants from moving any of the gold dust from the jurisdiction of the court. It was made without bond, and without suggestion of a bond. Judge Noyes testified that it was not his intention to order an injunction without a bond, and that if he so ordered in this instance it was by mistake. Marshal Vawter testified, and his testimony is not contradicted, that on October 10th, the day when the injunctions were issued, and some three hours before their issuance, McKenzie came to him and was very anxious to have the injunctions served that night, and wanted him to be ready to make the service. On October 15th, McKenzie was arrested at Nome upon an order of this court to show cause why he should not be held guilty of contempt for his disobedience to the writs of supersedeas. The defendants, on October 16th, made a motion in court to dissolve the injunction of October 10th. On the following day, W. T. Hume, one of the attorneys for the plaintiffs, stated in open court that he thought it was the duty of the plaintiffs' attorneys in that matter, and for their own good, to dissolve the injunction of their own motion, or for the court to dissolve it. Judge Noyes thereupon immediately said, "All of the injunction orders are dissolved forthwith."

The record and the evidence of these proceedings show from first to last, upon the part of Judge Noyes, an apparent disregard of the legal rights of the defendants in the cases in which McKenzie was appointed receiver. The proceedings upon which the receiver was appointed were extraordinary in the extreme. Immediately after his arrival at Nome in company with the man who, it seems, had gone to Nome for the express purpose of entering into the receivership business, and who boasted to others that he had secured the appointment of the judge, and that he controlled the court and its officers, upon papers which had not as yet been filed, before the issuance of summons, and before the execution of receiver's bonds, without no-

tice to the defendants, without affording them an opportunity to be heard, Judge Noyes wrested from them their mining claims, of which they were in the full possession, the sole value consisted of the gold dust which they contained, and which lay safely stored in the ground, and placed the claims in the hands of a receiver with instructions to mine and operate the same, and this without any showing of an equitable nature to indicate the necessity or propriety of the receivership, or the necessity for the operation of the mines by a receiver in order to protect the property or to prevent its injury or waste. When the defendants undertook to appeal from these orders, their right of appeal was denied them. The receiver so appointed was permitted to go on and mine these claims on an extensive scale, and extract from them their value. According to the testimony, some of the mines were "gutted." The appointment of the receiver was, in the case of Chipps vs. Lindeberg, almost immediately followed by an order authorizing the receiver to take into his possession all the personal property of the defendants which was found upon the claim, including their stores, provisions, tools, and tents. The order so made was so arbitrary and so unwarranted in law as to baffle the mind in its effort to comprehend how it could have issued from a court of justice. That it was not inadvertent is shown by the fact that, before making it, Judge Noyes was reminded that the suit involved the placer mining claim only, and by the further fact that the order was preceded by the threat to "tie up" the defendants and take away their property, and was followed three weeks later by the deliberate execution of similar orders in the other four cases. The appointment of the receiver in each case was in direct violation of the Code of Alaska, under which the court was organized (31 Stat. 451, § 753), which provides as follows:

"A receiver may be appointed in any civil action or proceeding, other than an action for the recovery of specific personal property—First, provisionally, before judgment on the application of either party, when his right to the property which is the subject of the action or proceeding, and which is in the possession of an adverse party, is probable and the property or its rents or profits are in danger of being lost or materially injured or impaired."

There is evidence of other arbitrary and oppressive action of the court in McKenzie's favor in cases in which he was receiver or was interested, notably the case of the Topkuk mine. It is shown that two of the original locators of that mining property went to Judge Noyes upon his arrival at Nome and complained of the action of certain trespassers, and that he referred them to his private secretary, Wheeler, saying that the latter was about to resign his office and take up the practice of the law; that they went to Wheeler, and he proposed that if they would give him a one-half interest in the mine he would secure them the full possession of their property within 24 hours; that they refused this exorbitant demand, and after some discussion were about to engage his services in consideration of a one-eighth interest, when negotiations were dropped, for the reason, it is suggested in the evidence, that McKenzie had become interested on the other side. An action of ejectment was then commenced by the persons whom the locators complained of, and one

Cameron was immediately appointed by the court receiver of the mining property, upon a bond of $10,000. He proceeded to operate the mine upon an extensive scale, refused to use the machinery which the owners had placed there at an expense of $6,000, and, instead, rented machinery from McKenzie at the rate of $50 per day, and bought supplies of him to the amount of $7,800. The owners attempted to protect their interests. They challenged the sufficiency of the bond and the ability of the sureties to respond, but without avail. They attempted to watch the clean-ups, but their right to be present was denied by the receiver. They applied to the court for relief, but the only relief they could obtain was an order that one of their number, who was designated by name, be permitted to be present at each clean-up simultaneously with one of the plaintiffs. The evidence is that a considerable portion of the time the plaintiffs declined to be present, and thereupon the receiver denied the right of the designated defendant to be present. When the defendants finally established their title to the property by the verdict of a jury, and the receiver was discharged, his account showed that he had taken out of the mine $30,000, while his expenses were largely in excess of that amount. The owners contended that he had taken from the mine more than $200,000. Upon a reference of the receiver's account to a referee appointed by Judge Noyes, it was found that the receiver had taken from the mine $100,000, and that his expenses were no more than $35,000. The evidence shows that neither the receiver nor his bondsmen have any property which can be found to apply upon this large deficit of $65,000. All these matters were properly shown to this court upon these proceedings, to throw light upon the transaction, to show the animus of Judge Noyes in those cases, and to aid the court to interpret the nature of his conduct in the matters upon which contempt is charged.

The charges are in substance that the respondent is guilty of contempt of this court in refusing to execute an order directing the receiver to obey the writs of supersedeas, in giving to the marshal and to Major Van Orsdale instructions to hold matters in statu quo and permit no one to have the gold dust, and in issuing the subsequent injunction of October 10th enjoining the defendants from removing the gold dust from the jurisdiction of the court. When the writs of supersedeas arrived at Nome, and their contents were made known to Judge Noyes, and an application was made to him for an order requiring the receiver to obey them, it was his plain duty to make that order. The receiver had refused to obey the writs. He was an officer of Judge Noyes' court, subject in all his conduct as receiver to be controlled by the order of that court, subject to removal or punishment for contempt in case of disobedience. If Judge Noyes believed the writs were void, it was none the less his duty to obey them, and to leave the question of their validity to the decision of the court whose writs they were. He had no warrant for saying that his hands were tied. The writs of supersedeas did not tie his hands so as to prevent his obedience to their own terms. In language which was neither uncertain nor doubtful, they directed him to go no further with the receivership, and McKenzie to surrender

all the property he had taken as receiver, including the gold dust. It is absurd to say that Judge Noyes was enjoined from ordering McKenzie to do the very thing the writs commanded the latter to do. It was no excuse for denying the application for the order that the bonds upon which the appeals had been allowed were less in amount than the value of the gold dust which the receiver had taken out of the claims. The inadequacy of the bonds, if they were inadequate, was no concern of Judge Noyes. The appeals had been allowed, it is true, upon bonds aggregating $100,000, but that sum was considerably larger than the sum total of the bonds which Judge Noyes had required of McKenzie as receiver.

Had Judge Noyes done nothing further than to refuse to make an order directing the receiver to obey the writs, however, we should hesitate to hold his refusal to be contempt of court. But he went further than that. Not only did he refuse to make the order, but, apparently fearful that the defendants in those cases were about to obtain possession of the gold dust under the writs, he issued to the marshal and to Major Van Orsdale directions to hold things in statu quo, and couched his directions in words which, upon their face and unexplained, we can construe no otherwise than as meaning that his purpose was to prevent the delivery of the gold dust to the defendants or to any one. These orders, it is true, were accompanied with the promise that the court would investigate the writs and issue such orders as might be proper for their enforcement, but, when the promised orders were finally made, they were orders not enjoining obedience, but the reverse. In framing the orders, Judge Noyes took the language of the supersedeas so far as it enjoined him from further proceeding in the receivership matter, and turned it into a general order of the court, which, if it had any force or effect at all, had the effect to inhibit the surrender of the gold dust by McKenzie, the receiver. But Judge Noyes disclaimed that he had any purpose to interfere with the writs or to obstruct their enforcement, and testified that his orders to the marshal and to Major Van Orsdale were made in consequence of the representations which the latter had made to him of the danger of violence, and were not directed against the delivery of the gold dust to the defendants, but were issued to preserve order and prevent riot and possible bloodshed. We have not disregarded the evidence which has been offered on behalf of Judge Noyes to explain the letters to the marshal and to Major Van Orsdale by reference to an alleged condition of lawlessness at Nome at that time which threatened the safety of the property and the funds in the bank. The evidence does not convince us that that state of things existed. On the contrary, the overwhelming weight of the evidence is that the only commotion that existed at that time was caused by the belief or the apprehension that the defendants in the suits, if balked by the refusal of the receiver to deliver the gold dust, would themselves take possession thereof. The evidence upon that point is to our minds so clear as to leave no room for doubt. We are convinced that Major Van Orsdale misunderstood the purport of the communication which he received from Judge Jackson. But, inasmuch as Major Van Orsdale

represented the situation to Judge Noyes as he has detailed it, we reckon with that fact, and with the element of doubt which it might create were it not for the other evidence in the case. All doubt is removed, however, when we come to consider the testimony of Marshal Vawter and Capt. French concerning the oral directions which they received from Judge Noyes in connection with the "statu quo" letters. Vawter was instructed, as he testified, to prevent the defendants in those cases from obtaining the gold dust. Capt. French, a disinterested witness, to whose testimony we must give full credit, testified that Judge Noyes directed him to issue no executive order in reference to the writs, which he understood to mean, and which could only mean, that Judge Noyes forbade him to issue an order that the gold dust referred to in the writs be turned over to the defendants in obedience to the commands of the writs. These oral instructions furnish evidence of the motive of the written instructions. In giving them, and in making the written instructions, the respondent willfully committed an overt act which had the direct effect to interfere with the execution of the writs of this court, and thereupon the charge of contempt must be sustained. Concerning the remaining charges against the respondent, it is not necessary to make extended comment. His action in issuing the writ of injunction of October 10th was attended by no features of contumacy or want of respect for this court, except the fact that it was made upon a petition which referred to the writs of supersedeas as "an alleged writ of supersedeas of the Circuit Court of Appeals," and the fact that when the injunction was allowed it was allowed without bond. It is significant, perhaps, of the purpose which these injunctions were intended to serve that on October 17th, after the arrival of the warrant of arrest of McKenzie, Judge Noyes of his own motion dissolved them.

In arriving at the conclusion which we have reached in this case, we have not failed to recognize the seriousness of the charge of contempt when laid at the door of a judge of a court, nor the necessity of maintaining a due regard for the judicial discretion which belongs to that office. It is essential, however, to the administration of justice that the process of courts be obeyed. Upon no one does this obligation of obedience rest with more binding force than upon a judicial officer. The respondent Arthur H. Noyes is adjudged guilty of contempt of the authority of this court by his resistance to the execution of its writs of supersedeas. In view of the fact that he holds a public office, it is the opinion of the court that the respondent be required to pay a fine. It is accordingly adjudged that he pay a fine of $1,000.

Thomas J. Geary, an attorney of this court, was cited to show cause upon evidence which had been furnished by himself in his testimony taken before this court on January 23, 1901, in the case of Kjellman vs. Rodgers, upon the proceedings which were instituted against Alexander McKenzie for contempt. Mr. Geary testified at that time that he was the attorney for McKenzie, the receiver, at Nome, and that on or about September 17th he discussed

with Judge Noyes the application which had been made to the latter for an order directing the receiver to turn over the gold dust according to the writs of supersedeas, in which discussion Judge Noyes said to him that he did not believe he possessed the authority to make such an order, and that the only order he could make was one staying proceedings, leaving the property where it was. The witness proceeded to say: "Under those circumstances, I advised Mr. McKenzie not to turn over the money." In the cross-examination which was then had appears the following testimony:

"Q. Was not your advice to McKenzie that the order was not appealable from, and for that reason he should not obey the writ of supersedeas? A. That was part of it; not all of it. * * * Q. Did you not advise him that the order of Judge Morrow allowing the appeal was void? A. Yes, sir; I advised that, because I thought that under the two cases that I have cited, that the order appointing McKenzie being merely an order appointing a receiver and not an injunction order, that Justice Morrow or this court had no jurisdiction of an appeal from the order appointing a receiver. Q. Had you any intention of advising McKenzie on the 15th to turn over the gold dust? A. I do not know how I can answer that any plainer than I have. I stated at that time that I advised Mr. McKenzie that evening after 6 o'clock that in my opinion the supersedeas did not require him to turn over the money. Q. After that writ had been served upon him, McKenzie, did you advise him not to obey that writ? A. Yes, sir. It did not change my opinion at all. If the original proceeding was void and the court had issued a writ it had not authority to issue, it was void."

In his testimony taken in the present proceedings, the respondent testified that he never at any time advised McKenzie to disobey the writs; that he went no further than to state to McKenzie his opinion of the law, and that he advised him that in his opinion not only the orders appointing him receiver were not appealable, but that the writs themselves did not require him to surrender the possession of the gold dust; and he testified that he gave McKenzie no advice whatever as to the course of action he ought to pursue in the matter. Upon his attention being directed to the specific testimony which he had given in the McKenzie case, and which is quoted above, he testified that either he did not catch the scope of the interrogatory, or that the testimony had been incorrectly taken by the reporter, and that he had not intended to testify as reported. In that connection he directed attention to the fact that, by the other questions and his answers thereto given in his former testimony, it appeared that he did not advise McKenzie in regard to his action, or advise him to disobey the writs. There is no other evidence in the case sustaining the charge that the respondent advised the receiver to disregard the writs or to disobey the orders of this court. The testimony of Kenneth M. Jackson tends rather to some degree to corroborate the evidence of the respondent in that regard. We think that, upon due consideration of the whole of the evidence against the respondent Geary, there is not sufficient to convince us beyond a reasonable doubt that he has been guilty of contempt of the court. The charge against him will therefore be dismissed.

Joseph K. Wood, the United States district attorney, went to Nome in company with McKenzie and Judge Noyes, and immediately

after his arrival, through the intermediation of McKenzie, became a silent member of the firm of Hubbard, Beeman & Hume, and appointed Mr. Hume his deputy district attorney. He corroborated the testimony of Hume to the effect that an arrangement was also made whereby McKenzie was to be a member of the firm and to receive one-fourth of the profits thereof, but he expressed a doubt whether the agreement was ever carried out. The charge which is made against Wood is that at the time of the arrest of McKenzie on October 15, 1900, the keys of the safe-deposit vaults in which McKenzie, as receiver, kept the gold dust which was to be delivered under the writs of supersedeas, had been given by McKenzie to Wood, and that when the officers, in the presence of McKenzie, demanded of Wood the possession of the keys, he refused to surrender the same. Geo. H. Burnham, one of the deputy marshals who went from San Francisco to arrest McKenzie and enforce obedience to the writs of supersedeas, testified that on October 15, 1900, while he had McKenzie in his custody under arrest, he and Shelley Monckton, the other deputy marshal, demanded of McKenzie the keys of the box which contained the gold dust in the Alaska Banking & Savings Deposit Company, and that McKenzie answered that he had given the keys to Mr. Wood, the United States attorney; that Mr. Wood soon thereafter came into the room, and Monckton said to him: "Mr. Wood, we understand you have the keys of the boxes that contain the gold dust in the Alaska Banking & Savings Deposit Company, deposited there by Mr. McKenzie, the receiver;" and that Mr. Wood said: "Do you understand I have the keys to those boxes? Understand nothing; I don't care what you understand;" and that Mr. Monckton then said: "Well, Mr. Wood, Mr. McKenzie has just informed us that he gave you those keys; that you were an officer of the court; that he thought the keys were safer with you than with himself; and I now make demand on you for those keys;" and that McKenzie then added: "Mr. Wood, I told the marshals you had the keys; that I thought they were safer with you than with myself;" that then Mr. Monckton said: "I make demand on you for those keys; have you the keys?" and that Wood replied: "I don't know whether I have them or not;" and that he then got up and went to the door, and as he was going to the door he said, "I will see you later." Dr. Cabell Whitehead, the manager of the bank, testified that when the deputy marshals came to the bank to obtain the gold dust he asked them if they had the keys, and they replied denying that they had them, and that afterwards he met Wood on Stedman avenue and told him that the deputy marshals were at the bank and wanted to see him, to which Wood replied that "the sons of bitches knew where to find him if they wanted to see him"; that the witness protested against the use of that sort of language to him, and told Wood he was simply trying to protect property, that he could not see any good purpose that could be served by breaking open those boxes, which the officers had a right to do and would do, and that Wood answered: "I will deliver those keys to no one until I have seen a certain person;" that the witness then said to Wood that he did not think there was time to see anybody, because the

marshals had been waiting some time, and he did not think they would wait much longer, and that Wood turned and went across the street and said: "Let them proceed with their damned burglaries." McKenzie testified that after he was arrested he handed Wood his pocketbook and keys, and told him he wished him to take possession of them, as he was afraid they were going to take him to jail, and he did not wish them to get possession of his private papers and private affairs, and that when the deputy marshals inquired of him if he had the keys he answered, "No," and informed them that Mr. Wood had them, and that shortly after .Wood passed through the room, and Monckton asked him if he had the keys, or requested him to give up the keys, and Wood said, "I will see about that later," and passed right on.` Mr. Wood never did surrender the keys, and the marshals were compelled to break open the boxes. In his answer upon the order to show cause the respondent states that his failure and refusal to give up the possession of the keys was not through a purpose on his part to hinder or obstruct the officers in discharging their duty, or to render ineffectual any order of this court, or to be in contempt of court, but alleges that he was acting on the belief that he had not the authority or the right to surrender possession of the keys without instructions from McKenzie, or against McKenzie's wishes as he understood them. We think the evidence fully. sustains the charges against the respondent Wood, and indicates upon his part a hostile attitude toward the officers of this court, whose duty it was to enforce the writs of supersedeas, and a disposition to willfully obstruct them in the performance of their duty.. We are disposed, however, in dealing with his case, to take into consideration the nature of the averments of his answer upon the order to show cause, and the apology which he subsequently made to this court. It is the judgment of the court that the respondent Joseph K. Wood is guilty of contempt of the lawful orders of this court, and that he be imprisoned in the county jail of Alameda county, Cal., for a period of four months.

C. A. S. Frost, an attorney at law, was sent to Nome by the department of justice as a special examiner to advise and instruct the clerk of the court and the marshal concerning their duties and accounts. He held that office until September 15, 1900, when he resigned to become assistant district attorney to Joseph K. Wood, in the place of Hume, who had resigned, which office he held until April 15, 1901, when he became the private secretary of Judge Noyes. Direct testimony in support of the charges against Frost is given by Marshal Vawter, who testified that the relations between Judge Noyes, McKenzie, and Frost were intimate; that on September 15, 1900, Frost told him that the writs of supersedeas were void, and on that date dictated to him the following letter:

"Hon. C. L. Vawter, U. S. Marshal, Nome, Alaska—Sir: Your attention is invited to that portion of section 846, Rev. St. U. S., which reads as follows: "That where the ministerial officers of the United States have, or shall incur extraordinary expenses in executing the laws thereof, the payment of which is not specifically provided for, the President of the United States has the authority to allow the payment thereof under special taxation of the District

or Circuit Court of the district in which the said services have been or shall be rendered, to be paid from the appropriation for defraying extraordinary expenses of the judiciary.' If it shall be necessary for you to incur extraordinary expenses under this statute in suppressing specific unlawful acts, acts of violence or attempted violence, burglary, robbery, etc., you will be authorized to employ such force as may be necessary in the premises, and the necessary expenses thereof incurred by you may be included in an extraordinary expense account to be rendered and paid as provided in said action.

"Respectfully,                                          C. A. S. Frost."

The marshal testified that the letter was accompanied by an order to swear in a large posse comitatus to prevent the delivery of the gold dust to the Lane crowd or to the Pioneer people, and that Frost at the same time remarked that such delivery must be prevented at all hazards, and that he said:

"They are going to try to take it by force, and these writs that have been sent up here will be declared void by the Supreme Court. You must obey this court; you are the executive officer of this court here."

Frost in his testimony contradicted the marshal as to all essential features of his testimony, except that he admitted having written the letter, but the marshal is so well corroborated that we entertain no doubt of the truth of his testimony. Geo. Leekley, who was the marshal's deputy and clerk, and who occupied the same room with Frost, testified that a day or two after September 14th, the date when the writs of supersedeas arrived at Nome, he had a conversation with Frost, in which the latter stated that it was the duty of the marshal by all means to preserve the gold dust intact in the bank in which it was then deposited, and prevent the defendants in said cases and the owners of the gold dust from securing the same under the writs. He also testified that Frost was the confidant and intimate friend and adviser of McKenzie and Judge Noyes, and spent a great deal of time in their company. There are other facts which are fully proven in the case, and which show the deep personal interest which Frost had in the McKenzie receivership, and his partisanship for McKenzie's cause in the controversies then pending. It is proven that in August, 1900, Frost, in violation of his duties as an officer of the United States, and for the purpose of aiding McKenzie, employed, on behalf of the United States, three detectives, Carson, Carroll, and McLean, who for such services during the latter part of August, all of September, and a portion of October, were paid by the department of justice, two of them $10 per diem and their expenses, and one $15 per diem and his expenses, and that the purpose for which the detectives were employed, and the sole service which they rendered, was to watch the movements of the defendants and their attorneys in the cases in which McKenzie was receiver. Frost admitted the employment of these men, but stated that they were engaged for the purpose of ferreting out certain efforts which he had heard were being made to corrupt the jury panel of the District Court. The explanation which he gave is inherently improbable. He testified, in substance, that it came to his knowledge that attempts were being made to get persons on the jury panel, and that names were being furnished by interested parties to that end, and that it was

for the purpose of ascertaining who was doing this, and to prevent the corruption of the jury panel, that the three detectives were employed. He declined to state the nature of his information, claiming that it was a confidential communication. On cross-examination he testified that he gave the detectives no instructions to watch any particular person, but simply informed them that he had been informed that attempts were being made to corrupt the jury panel, and that he wanted them to find out who was doing that work. He testified that he received from them reports from time to time, but he declined to divulge the nature of their reports. On further cross-examination it was shown from the witness that there were upwards of 300 names drawn for the grand and petit jury; that the names were selected one-half by the clerk of the court and one-half by the jury commissioner; that Frost made no inquiry of the clerk nor of the jury commissioner, and had no talk with either of them on the subject, and directed no investigation of either; that he gave to his detective no instructions whatever concerning either of these officers, and that he directed no investigation of the 300 names which were put in the box for jurors, and never personally saw that list or made any investigation of it. He admitted that these detectives were paid, under the order of the judge, out of funds in the hands of the clerk. On further cross-examination he testified to a conversation which he had with Judge Noyes concerning lists of names that were presumably to be put into the jury box, and stated that Judge Noyes showed him the lists, and an affidavit accompanying them to the effect that certain persons had been furnishing names for the jury panel, and stated that Judge Noyes asked him if he knew of any way in which he could find out who the parties were who were attempting to corrupt the jury panel, and that he, Frost, had replied by saying that while he was in the department of justice the Attorney General had authorized the employment of persons to investigate that sort of thing, and that he informed the judge that if, in his opinion, it was necessary or advisable to employ some one for that purpose, he thought it might be done. He further testified that Judge Noyes told him that the lists had been furnished by attorneys, and that they were in the handwriting of two persons named. This testimony is not corroborated by Judge Noyes. He testified that he did not make any inquiry as to where the lists were obtained, and that he does not remember that any one told him the lists had been furnished by attorneys, and that he could not have told any one whose handwriting the names were in, and that he could not have shown Frost those lists earlier than August 25th, because the affidavit which was attached thereto was dated August 25th. There is positive and direct testimony of other witnesses concerning the purpose for which the detectives were employed. John F. Mercer, who was a deputy marshal, and who had been a captain in the First Montana Regiment in the Philippines, a man of standing and of good repute so far as the evidence shows, testified that Frost told him that he wanted those detectives to watch Judge Johnson, Mr. Metson, Mr. Knight, Judge Jackson, Lane, their attorneys and following, and report to him their actions and doings. The witness testified that Frost stated to

him that they were watching these people; and that Frost told him that they "had the means of ascertaining what was going on in certain neighborhoods, notably the judge's chambers." "I know," said the witness, "they were watching Mr. Metson's office; I know they were watching Judge Jackson very closely." Mercer further testified that he saw these detectives giving their reports to Frost; that on one night one of them, Carson, reported that an attempt was to be made by the defendants in those suits to take certain gold dust out of the bank. That immediately after, Frost conferred with the witness, and told him what Carson had reported, and said, "It must be prevented," and that he went out with Frost late that night to the bank, and that Frost seemed very much excited, and thought they ought to make a general alarm, and that this happened on the night of the arrival of the writs of supersedeas. Marshal Vawter testified that L. D. McLean, one of the detectives, told him that he was employed as a spy upon the attorneys and owners of those Anvil Creek claims of which McKenzie was receiver. Dr. Cabell Whitehead, manager of the bank, testified that McKenzie came to him frequently and told him of reports which his detectives had made to him, and that on one occasion he referred to McLean as one of his detectives, and reported a conversation which he said McLean had overheard through the wall of the room adjoining W. H. Metson's office. W. H. Metson testified that Carson was already employed by him before Frost engaged him as a detective, but that Frost was evidently not aware of that fact. That Carson came to him and reported to him that Frost had engaged him for the purpose of watching him, Metson, and had directed him to seek employment from Metson in order to be in a position to watch his movements and report the same to Frost. That thereupon he, Metson, ostensibly and openly employed Carson, and from that time on Carson made regular reports to Frost, and that the reports were first submitted to Metson for his supervision. Geo. A. Leekley testified, also, that on the night of the arrival of the writs of supersedeas Frost made several trips to the bank, and that Frost informed him that he had just received information that the defendants and owners of the gold dust were going to attempt to take the dust from the bank that night. George V. Borchsenius, the clerk of the court, testified that he objected to the payment of the bills of these detectives, for the reason that he did not think they were proper bills, but that Judge Noyes ordered him to pay them immediately, and said to him that he could either pay them or be in contempt of court. The amount of McLean's bill was about $900. The amount paid to the others is not stated. The whole of the evidence concerning the case of Frost convinces us beyond any reasonable doubt that he not only aided and abetted to the utmost of his power the efforts of McKenzie to obstruct the execution of the writs of supersedeas, but that in his official capacity he grossly betrayed the interests of the United States which were intrusted to his care. The respondent C. A. S. Frost is adjudged to be in contempt of the lawful orders of this court, and for his contempt it is the judgment of the court that he be imprisoned in the county jail of Alameda county, Cal., for a period of 12 months.

ROSS, Circuit Judge (concurring). The findings of fact in the cases of Arthur H. Noyes, Joseph K. Wood, and C. A. S. Frost, embodied in the foregoing opinion of my Brother GILBERT, to the effect that each of those parties committed the contempt alleged against him, meets with my concurrence; but I am of the opinion that the records and evidence in the cases show beyond any reasonable doubt that the circumstances under which and the purposes for which each of those persons committed the contempt alleged and so found were far graver than is indicated in the opinion of the court, and that the punishment awarded by the Court is wholly inadequate to the gravity of the offenses. I think the records and evidence show very clearly that the contempts of Judge Noyes and Frost were committed in pursuance of a corrupt conspiracy with Alexander McKenzie, and with others not before the court, and therefore not necessary to be named, by which the properties involved in the suits mentioned in the opinion, among other properties, were to be wrongfully taken, under the forms of law, from the possession of those engaged in mining them, and the proceeds thereof appropriated by the conspirators. For those shocking offenses it is apparent that no punishment that can be lawfully imposed in a contempt proceeding is adequate. But a reasonable imprisonment may be here imposed, and I am of the opinion that, in the case of the respondent Arthur H. Noyes, a judgment of imprisonment in a county jail for the period of 18 months should be imposed, and in the case of Frost a like imprisonment of 15 months.

The facts and circumstances against the respondent Wood are by no means so strong, although I find it difficult, if not impossible, to reconcile his ignorance of and disconnection with the conspiracy with the facts that immediately upon his arrival at Nome he was, at McKenzie's dictation, given a one-fourth interest in the firm of Hubbard, Beeman & Hume (which firm was employed to carry on the legal part of the nefarious business), and that Hume (who was, so far as appears, a total stranger to Wood) was, likewise at McKenzie's dictation, immediately appointed by Wood assistant United States attorney. I think Wood should be imprisoned for 10 months.

In regard to the respondent Geary, I agree with the finding of the court to the effect that the contempt alleged against him is not sufficiently established. Reading and considering Geary's entire testimony, and especially his written opinion given McKenzie at the time of the occurrences in question, and in the light of the testimony of Mr. Metson, I am of the opinion that it is not shown that he went beyond the legitimate privileges of an attorney in giving his legal advice. I therefore concur in the dismissal of the proceedings against him.

MORROW, Circuit Judge (concurring). I concur in the findings of fact contained in the opinion of Judge GILBERT in the cases of Arthur H. Noyes, Joseph K. Wood, and C. A. S. Frost, and in the judgments directed to be entered thereon. I am also of the opinion that the evidence does not establish the charge against Thomas J. Geary.

In my judgment the evidence establishes the fact that there was a conspiracy between the respondent Noyes, McKenzie, and others to secure possession of certain valuable mining claims at Nome, Alaska, under proceedings involving the appointment of a receiver for the purpose of working the properties and obtaining the gold deposited in the claims. To carry these proceedings to a supposed successful conclusion, Noyes, McKenzie, and others found it a necessary part of their scheme to resist the process of this court. In pursuance of this conspiracy, the contempt charged against Noyes was committed; but I agree with Judge GILBERT that this conspiracy is outside the charge of contempt, and, in view of the fact that the respondent Noyes holds a judicial position, I concur in his judgment that the respondent be required to pay a fine of $1,000.